**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| ETHAN R. H.,[1]<br><br>Plaintiff,<br><br>vs.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | No. 25-CV-96-CJW-KEM<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Ethan R. H. seeks judicial review of a final decision of the Commissioner of Social Security denying his application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Plaintiff argues that the administrative law judge (ALJ) made several errors, particularly in finding his migraines nonsevere and failing to include the use of a cane in his residual functional capacity (RFC). I recommend **reversing** the ALJ's decision.

## *I. BACKGROUND*

### *A. Work History and Back Pain Treatment*

Plaintiff graduated high school in 2010. AR 377.[2] Around 2013, he was involved in a car accident resulting in back pain. *See* AR 530, 542. From 2016 to 2019, he worked full-time at Home Depot selling flooring, helping customers with power-tool

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] "AR" refers to the administrative record filed at Doc. 4.

rentals, and watering plants in the garden center. AR 68-69, 388, 475. In 2017, he underwent physical therapy for "back pain and shooting pain down [his] legs," more "extreme" than the "daily back pain" he was "used to." AR 530-40. He quit after four sessions, reporting he "fe[lt] wonderful" and the pain had "disappeared." *Id.*

From June 2019 to January or March 2020, he worked full time at Fleet Farm as a hardware specialist. AR 70-71, 388-89, 475. In late July 2019, he injured his chest at work stocking shelves. AR 541. He underwent physical therapy in September and October 2019. AR 541-59. At one appointment in October, he reported "[t]echnically" "doing his regular job with help," but at the next visit, he said that he could not stock shelves, reach across his body to be a cashier, or unload a truck due to his restrictions. AR 553, 555. In late October 2019, he began occupational therapy for work conditioning. AR 559-69. The occupational therapist's treatment notes question Plaintiff's subjective pain complaints, noting "performance discrepancy" and "inconsistent" results on "repetitive test[s]," as well as reporting pain after a session on the high end of the pain scale, despite "increas[ing] workload without any election to stop any task performance and no failure of any body mechanics." AR 562, 567. After four sessions, the occupational therapist recommended discharge due to "no concern for his ability to safely perform work related tasks" but left the discharge decision up to Plaintiff's provider at an upcoming appointment. AR 569. Plaintiff reported that Fleet Farm ultimately terminated his employment for attendance issues due to his lung and chest pain. AR 70-71.

Plaintiff worked full-time as a clerk at a pawn shop for a few months beginning in April 2020. AR 71-72, 388, 391, 475.[3] He testified that after his back pain began, he

[3] Plaintiff testified at the September 2022 hearing that he worked at the pawn shop for three months and had not applied for jobs "since June of 2020 or July of 2020" when his back pain and spinal issues began. AR 71-72. He alleged a disability onset date (in January 2021) of June 22, 2020 (AR 92); as discussed further below, he presented to the ER with back pain on *July* 22, 2020 (AR 500). In a January 2021 function report, he reported working through June 2020

went on short-term disability before being terminated. AR 72; *see also* AR 680, 729. He reported to providers contemporaneously at the time that he could not stand long hours or lift, push, or pull as required for his job due to pain. AR 592.

On July 20, 2020, Plaintiff went to urgent care complaining of low back pain radiating to his right leg after his mom tried to "crack his back this morning" with a bear hug and his back "pop[ped]." AR 861-62; *see also* AR 860. On objective examination, the provider noted no distress, lumbar spine tenderness along the right sacroiliac joint, normal straight leg tests, intact strength, normal reflexes, diminished sensation in the right leg, and ability "to get up and down from the exam table without assistance and ambulating normally." The provider prescribed prednisone (a steroid) and methocarbamol (Robaxin) (a muscle relaxer).

Plaintiff returned to urgent care two days later (on July 22), reporting no improvement and that he was now suffering weakness and numbness in his right lower leg, causing his right foot to drag. AR 860-61. On objective examination, the provider noted no distress, lower back tenderness radiating to the buttock, no right knee reflex, decreased sensation in the right lower leg, an inability to dorsal or plantar flex the foot, and an inability to dorsiflex during ambulation and shuffling his foot. Given the progression of his symptoms, the provider recommended his mother (who was with him) take him to the emergency room (ER).

---

(AR 388); and in a February 2024 function report, he reported working through August 2020 (AR 475). It appears pretty obvious to this court that Plaintiff worked until his injury in July 2022, but the ALJ relied in part on the discrepancy between Plaintiff's alleged onset date and his emergency room presentation in discrediting Plaintiff. *See* AR 24; *see also* AR 579 (treatment note from August 13, 2020, reflects Plaintiff had "missed most of the last month of work due to his pain"); AR 592 (treatment note from September 16, 2020, reflects Plaintiff "has been unable to work since that [July 2020] onset of his pain"); AR 598 (treatment note from October 28, 2020, reflects plaintiff was "[r]eleased from his previous job" when he "ran out of FMLA").

On July 22, 2020, Plaintiff presented to the ER for an "urgent back MRI"[4] at the urgent care provider's direction. AR 500-05. He reported that two days prior, his mother had given him a bear hug, and he heard several pops in his lower back and had suffered increased right lower back pain since. He reported "sharp, severe, constant" pain that radiated down his right leg to mid calf and then turned to numbness, causing "right foot drop and difficulty walking." He said prednisone and methocarbamol, started two days prior, had done little to help his pain. On objective exam, providers noted Plaintiff was "not in acute distress," had normal musculoskeletal range of motion, "diffuse lower back pain," and no redness or swelling. Neurologically, the provider noted full and symmetric motor activity in all extremities except his right leg; "sensation to light touch" in all extremities; "able to bear weight" with a right-sided limp; "[w]ith leg straight[,] he is able to wiggle his toes, but has minimal to no effort with both dorsi and plantar flexion, and inversion/eversion"; and "[h]e states he is unable to lift his leg or move distally to hip, however, when asked to flex at his hip[,] he is then able to lift leg fully off bed and fully flex and extend at both hip and knee and keep leg elevated." When reexamined an hour and a half later (after receiving hydrocodone for pain relief), he was able to safely walk with a walker and "keep his ankle in full dorsi-flexion with no foot drop and is bearing weight." An MRI showed "degenerative disc disease at L2-L3, with mild right foraminal stenosis." Based on the MRI results, the ER doctor found no "emergency" condition such as "abscess, spinal lesion, nerve compression, [or] stroke, . . . especially given improved exam on walking and with distraction." The doctor noted the "physical exam doesn't fit with significant acute spinal pathology and could likely be pain related." The doctor concluded symptoms had been controlled in the ER and were "[l]ikely significant low back pain [with ]sciatica." The "orders" lists includes a walker, and the discharge note indicates "walker given to help with safety of ambulation." The ER doctor

[4] Magnetic resonance imaging.

directed Plaintiff to follow-up with his primary care provider and physical therapy. A nurse noted steady gait at discharge.

On July 27, 2020, Plaintiff began physical therapy. AR 570-72. He "present[ed] ambulating with [wheeled] walker" and reported balance issues, back pain, right foot numbness and foot drop, and not driving or working since the injury. At the first appointment, the physical therapist concluded "multiple sites of tenderness with light palpation . . . , displays pain behaviors, grimacing with movement and leaning toward table instead of moving feet when asked to sit to treatment table, [and] reports inability to lift right leg" for manual muscle testing, "although does have active movement with gait" (Plaintiff walked 165 feet with the walker "not full step with right [lower extremity]"). She suggested his primary care provider consider a neuropsych referral "as [patient] does not present as musculoskeletal."

On July 29, 2020, Plaintiff met with his primary care provider, physician assistant (PA) Teresa Stewart. AR 645-50. He continued to rate his pain 8/10 on the pain scale, exacerbated with movement. He reported weakness in his right leg and numbness at the top of his foot into his toes. On objective examination, his provider noted he moved "slowly and stiffly with a walker"; was "diffusely tender throughout his lumbar spine and bilateral lower lumbar regions even to very light touch"; had a positive right-sided straight leg raise; 5/5 strength on the left leg and 4/5 strength with right hip and knee flexion and extension and 3/5 strength with right foot dorsiflexion and plantarflexion; normal ankle and knee reflexes; and pain complaints with axial loading (one of the Waddell's signs[5]). PA Stewart reviewed his MRI with him and explained that the mild foraminal stenosis shown would not cause pain and problems all the way to his foot. She noted his physical therapist thought physical therapy might not help because she had observed positive "Waddell's signs"—"a group of inappropriate responses to physical

[5] *See* note 14, *infra*.

examination" for low back pain that may point to a "psychological" component to the pain.[6] PA Stewart recommended increased physical activity with stretches, prescribed gabapentin (a nerve medication) and diclofenac sodium (Voltaren) (an NSAID[7]), and referred Plaintiff to the pain clinic.

Plaintiff had three additional physical therapy appointments. AR 573-78. On July 31, he reported his pain had not changed. The physical therapist noted he "tolerated exercise without increased complaints of pain." On August 4, he continued to report pain but "a little more mobility," and the physical therapist noted he could perform all exercises, although he "did grimace and hold his right hand on the right leg throughout treatment" while moving his right leg independently. On August 7, he reported he did not "feel[] too bad," he had "more mobility but the pain isn't going anywhere," and he "wakes up in 'excruciating pain.'" The physical therapist noted he was "able to perform [exercises] correctly with cues/instruction." He "did not return for further visits following the derecho" (a high wind weather event that caused destruction across eastern Iowa).

On August 10, 2020, Plaintiff met with his primary care provider, PA Stewart. AR 660-63. He continued to report back pain that he rated 9/10 on the pain scale with diffuse weakness in the left leg. He reported lying down improved his pain and movement made it worse. On objective examination, PA Stewart observed no acute distress, walking with walker slowly, diffuse bilateral lumbar paraspinal tenderness even to light touch; decreased spinal range of motion; 5/5 strength in the right leg and 4/5 diffuse strength in the left hip, knee, and ankle; and negative straight leg tests. She prescribed cyclobenzaprine (Flexeril), a muscle relaxer, and referred him to physical medicine and rehabilitation (in addition to the pain clinic).

---

[6] Samuel D. Hodge, Jr. & Nicole Marie Saitta, *What Does It Mean When A Physician Reports That A Patient Exhibits Waddell's Signs?*, **16 Mich. St. U. J. Med. & L. 143**, 156 (2012).

[7] Nonsteroidal anti-inflammatory drug.

On August 13, 2020, Plaintiff met with Stephen Maze, MD, a doctor at the pain clinic. AR 578-83. Plaintiff said that he originally injured his back on July 20 and the pain worsened on July 22. He said he "felt a pop in his back while doing physical activity." He reported the pain began in his low back and traveled down his right leg to the ankle, and he additionally reported numbness and tingling in his right foot. He said when he was first injured, he could "scarcely move" and had to use a walker, but it had "improved . . . slightly" so he could use a cane to walk. He still reported his current pain as 8 out of 10 on the pain scale. He said his pain felt best lying down and worst sitting and standing. He reported missing most of the last month of work due to pain and that physical therapy had not been beneficial. On objective examination, Dr. Maze noted "symmetric musculature in the lower extremities"; diminished dorsiflexion on the right side; "slight decreased strength with plantarflexion on the right side versus the left but . . . not a striking difference"; symmetric patellar reflexes; and no ankle call reflex on the right side. Dr. Maze noted that the "radicular symptoms on the right side . . . do not quite correlate with his MRI findings," but "[h]e does seem to have definite weakness." Dr. Maze performed an interlaminar epidural steroid injection at L4-5.

On August 21, 2020, Plaintiff had an appointment with PA Stewart. AR 666-69. Plaintiff reported that his pain was a little better (although he still rated it as an 8/10 on the pain scale) and that it felt better for one day after the epidural the week before but then returned. He reported no longer needing the walker and using a cane instead. He noted getting more mobile and walking around his home; his right leg still felt weak and his right foot had decreased sensation but was no longer numb. He noted continued difficulties shifting positions (from lying to sitting, from sitting to standing), walking, and climbing stairs, and could only tolerate sitting. On objective examination, PA Stewart observed no acute distress, diffuse mild lumbar paraspinal tenderness, decreased spinal range of motion, positive right straight leg raise, 4/5 strength in the right hip, knee, ankle, and toes; normal reflexes that "required distraction"; and "pain with axial

pressure on spine." PA Stewart increased his gabapentin dosage and reached out to physical medicine to additionally request an EMG. She wrote Plaintiff "a note for work [at the pawn shop] stating he can work if he is able to only sit without any lifting, bending, carrying, or walking" until September 7.

On August 26, 2020, Plaintiff spoke with a pain clinic nurse by telephone. AR 836. He reported his pain had been between 7 and 10 prior to the epidural steroid injection; after the injection, his pain disappeared for one day; then his pain returned and was currently 7 or 8 out of 10. Dr. Maze indicated he "normally would try a [transforaminal epidural steroid injection], but [Plaintiff's MRI] is not consistent with his symptoms." Dr. Maze indicated he "worr[ied] something is being missed as he seems legitimate" and recommended a neurosurgical consult. Plaintiff stated "he already has an [appointment] with a neurosurgeon."

On September 4, 2020, Plaintiff met with PA Stewart. AR 679-82. He reported persistent pain that was "slowly improving." He continued to report pain in the right lower back, as well as in the left lower back with movement. He also noted radiating pain to the right knee (improving) and mild weakness in the right foot (unchanged). He said he was more active and had gone out to eat, saying he could walk further distances as long as he used the cane. He reported he had been fired, since he had only worked at the pawn shop for a short time. On objective examination, PA Stewart found no acute distress; diffuse tenderness through the entire lumbar region; positive right straight leg raise; normal ankle jerks and 1+ right knee jerks;[8] 4/5 strength on flexion and extension of the right hip, knee, and foot; and increased pain with axial load on his spine if PA Stewart "push[ed] against his feet with leg extended." PA Stewart increased his gabapentin dosage, since it was helping.

[8] "1+" signals "[a] small reflex response, but noticeably less than it should be." ***Deep Tendon Reflexes***, Cleveland Clinic, https://my.clevelandclinic.org/health/diagnostics/deep-tendon-reflexes-dtrs (Apr. 16, 2026).

On September 9, 2020, Plaintiff had an EMG[9] appointment at 10 a.m. with Devin Smith, MD, at physical medicine and rehabilitation. AR 583-87. He continued to report right leg weakness and said using his muscles increased pain such that he could not lift things or drive due to leg pain. He said he had tried physical therapy, gabapentin, and epidural steroid injection without relief. He noted he had been walking with a tri-tip cane. On objective examination, the provider noted "active [range of motion of the lumbar spine] is limited in all directions with pain," "very painful with any palpation of the hip or lumbar spine," negative straight leg test to 70 degrees on the left side and an inability to go beyond 20 degrees on the right due to pain; an inability to examine the right hip due to pain; normal range of motion of the hip, knee, and ankle on the left but inability to test the right due to pain; "[e]xtreme pain with palpation of right greater trochanteric bursa, left hip"; no focal atrophy in any extremity; normal knee and ankle reflexes; and patient reported "60% sensitivity on the right compared to the left leg" for light touch and pin prick sensation testing. The provider also noted normal strength on the left but 1/5 strength on the right from the hip to the ankle (except 4/5 strength for knee extension), with an asterisk on the right examination findings noting "Plaintiff was able to walk using cane." Plaintiff's EMG test was normal with no evidence of radiculopathy, although the provider noted "EMG is only sensitive to axonal motor changes . . . , so radiculopathy cannot be excluded though it is unlikely." The provider did note "limited activation in the right lower extremity" during testing, "possibly due to pain inhibition." The provider concluded his "pain is out of proportion with exam in addition to relatively benign radiological and physical findings," making "**complex regional pain syndrome more likely (despite lack of autonomic dysfunction)**, other considerations would include conversion[10] and malingering." The provider noted a "trial

[9] Electromyography test.

[10] "[C]onversion disorder . . . features nervous system (neurological) symptoms that can't be explained by a neurological disease or other medical condition," but "the symptoms are real and

of oral steroids . . . may help" complex regional pain syndrome. The provider also noted a "more favorable prognosis" because of the lack of evidence "of nerve or muscle pathology" causing patient's symptoms," and suggested Plaintiff could benefit from continued physical therapy and a "pain empowerment program for symptoms management."

After the EMG, Plaintiff met at 11:15 a.m. with a nurse practitioner at physical medicine. AR 589-91. On objective examination, she observed Plaintiff to be in moderate distress; ambulating with an antalgic gait using a cane; lumbar paraspinal tenderness, worse on the right and radiating down the leg; passive range of motion of the lumbar spine limited by pain; negative straight leg tests on both sides; 5/5 strength on manual motion testing; negative Hoffman sign bilaterally; Babinski flexor bilaterally; and sensation intact to light touch with reported decreased sensation in the right leg as compared to the left.[11] Her impression was enthesopathy of the lumbar spine. As the EMG doctor had recommended, she prescribed a Medrol (steroid) dose pack and provided Plaintiff a brochure on the pain empowerment program. She also educated Plaintiff on using a TENS[12] unit, heat, and stretching, and indicated they would work to get insurance approval for injections.

On September 16, 2020, Plaintiff returned to a nurse practitioner at physical medicine. AR 592-94. He reported no improvement after the Medrol dose pack. He

---

cause significant distress or problems functioning"; "[t]he cause . . . is unknown" and "may be triggered by a neurological disorder or by a reaction to stress or psychological or physical trauma." ***Functional neurologic disorder/conversion disorder***, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/conversion-disorder/symptoms-causes/syc-20355197 (Jan. 11, 2022).

[11] Additional physical medicine appointments largely reflect these same findings (by both the nurse practitioners and Dr. Mathew). AR 593, 595-96, 606, 609, 730, 737, 792, 803; *see also* AR 756, 764, 767, 770, 785, 1065, 1102, 1128, 1404-05, 1436, 1454, 1473, 1494, 1502 (beginning in August 2021, Dr. Mathew observed 4/5 strength in both legs, weaker on the right).

[12] Transcutaneous electrical nerve stimulation.

continued to report back pain radiating to his right leg that he rated at 9 out of 10 and walked with a cane. The treatment record reflects the same objective results as at the last appointment in August 2020, including in "moderate distress" (some of the treatment note is obviously copied and pasted, e.g., it talks about the EMG test "today," so it is possible the physical exam results were as well). The provider performed six lidocaine trigger point injections, and Plaintiff reported 70% improvement in his pain afterward. The provider noted she was "in agreement with his disability application."

On October 14, 2020, Plaintiff returned to physical medicine for trigger point injections, this time seeing a different nurse practitioner. AR 594-96. He continued to report back pain 8/10. Plaintiff reported his pain improved by 80% post-injection. The provider referred Plaintiff to aquatherapy and suggested he discuss with his primary care provider switching from gabapentin to Lyrica.

On October 28, 2020, Plaintiff had his first aquatherapy session. AR 597-99. He reported requiring "frequent breaks with standing, walking, [and] stairs due to pain and fatigue." He also reported worsened pain with sitting, standing for more than five minutes, walking, lifting, and carrying. He said rest, medications, heat, and the TENS unit (while in use) helped his pain. He reported "mild, short-term relief" from the epidural and trigger-point injections. He rated his back pain 9/10 radiating to the right thigh and numbness in the lower right leg and foot. On objective examination, the physical therapist noted Plaintiff walked with a cane "with antalgic-appearing gait with excessive trunk flexion," and had 75% limited range of motion of the lumbar spine due to low back pain. The physical therapist found normal strength on the left but was "unable to accurately grade [right] hip, knee, [and] ankle strength due to inconsistency from [patient]; for example, patient was asked to [dorsiflex] both feet with heels on floor, I rested my hands on dorsum of each foot and only provided resistance to [left] foot, however [patient's right] foot simultaneously dropped." The provider also observed Waddell's signs. A finding of three of the five Waddell's signs—tenderness, simulation,

distraction, regional, and overreaction—indicates a "nonorganic source[] of lower back pain."[13] The physical therapist noted simulation with axial loading (Plaintiff complained of low back pain with light pressure on his upper trapezoids while standing) and trunk rotations;[14] overreaction;[15] and regional weakness on the right.[16] The provider concluded that Plaintiff presented with low back pain and right leg pain "most consistent with lumbar radiculopathy" but that "inconsistencies with evaluation" could be a "barrier[] to goal achievement."

---

[13] **Hodge & Saitta**, *supra* note 6, at 156 (quoting ***Anderson v. Astrue***, No. 09-0971-TC, 2011 WL 1655552, at *8 (D. Or. Mar. 25, 2011)).

[14] As explained in a medical law journal:

> The second sign, simulation testing, tricks the patient into believing that a physical examination is taking place when, in fact, nothing is truly being examined. If a particular movement causes pain, that same movement is simulated but not actually performed to see if the patient continues to report discomfort. For example, the axial loading test provides "vertical loading over the standing patient's skull by the examiner's hands." The patient's head is gently pushed down, and if low-back pain is reported, the finding is considered a positive Waddell's sign since it is not anatomically possible for this maneuver to replicate low back pain. As for the rotation test, "back pain is reported when shoulders and pelvis are passively rotated in the same plane as the patient stands relaxed with the feet together."

***Id.*** (cleaned up) (quoting Gordon Waddell et. al., Nonorganic Physical Signs in Low-Back Pain, **5 SPINE 117**, 118 (Mar./Ap1980)).

[15] Overreaction includes "disproportional verbalization, facial expression, muscle tension and tremor, collapsing, or sweating"; "very graphic and exaggerated pain responses, [such as] grunting or groaning." ***Id.*** at 158 (cleaned up) (first quoting **Chai Rasavong**, PT Classroom - A Review of Waddell's Nonorganic Signs for Low Back Pain, CYPERPT (Oct. 18, 2010), http:// www.cyberpt.com/waddellssigns.asp; then quoting ***Russell v. Invensys Cooking & Refrigeration***, 174 S.W.3d 15, 19 (Mo. Ct. App. 2005)).

[16] The category of "regional disturbances[] indicates a nonorganic source of pain, such as muscle weakness, that 'cannot be explained on a localized neurologic basis' and 'diminished sensation to light touch'"; "[i]n other words, these changes deviate from normal accepted neuroanatomy." ***Id.*** (quoting **Waddell et al.**, supra note 14, at 119).

Plaintiff had two additional aquatherapy sessions. AR 600-05. On November 3, he reported he was "not too bad," and the physical therapy assistant noted he was "able to perform all [exercises] without reports of discomfort." On November 10, he said he had "been feeling better the last few days," and he performed exercises without additional pain. The physical therapist observed that he "ambulate[d] with a cane" in his left hand at times and in his right hand at times, and that he led with his left leg when descending stairs, "despite complaints . . . of [right leg] weakness." The physical therapist noted he would likely be discharged after the next session, but Plaintiff was a "no show" at his next appointment; and he canceled his next appointment stating said he no longer had a ride to appointments.

On November 15, 2020, Plaintiff returned to physical medicine, seeing Dr. Stanley Mathew, MD, for the first time. AR 605-07. Dr. Mathew performed trigger point injections. He adjusted Plaintiff's medications, swapping Lyrica for gabapentin (nerve medications) and methocarbamol for Flexeril (muscle relaxants).

Plaintiff next saw Dr. Mathew on December 15, 2020. AR 730-32. He rated his back pain as 7/10, and Dr. Mathew noted his pain "respond[ed] well to injection therapies." Dr. Mathew performed trigger point injections.

On January 12, 2021, Plaintiff returned to a nurse practitioner at physical medicine. AR 608-10. He rated his "low back pain . . . as mild to moderate" and "decline[d] the need for injections." The narrative states he was taking Lyrica, Flexeril, and diclofenac; the provider concluded that he should "continue Lyrica" and take methocarbamol; and the "current medications list" at the end of her treatment note lists both Lyrica and gabapentin, methocarbamol (rather than Flexeril), and diclofenac. *See also* AR 378 (Plaintiff reported to the Social Security Administration in mid-January 2021 taking Flexeril and gabapentin prescribed by his primary care provider, Lyrica and methocarbamol prescribed by physical medicine, and methylprednisolone prescribed by the hospital); AR 399 (Plaintiff reported to the Social Security Administration in early

February 2021 taking only Lyrica and methocarbamol). That same day, January 12, Plaintiff applied for disability. AR 93. He alleged a disability onset date of June 22, 2020, based on degenerative disc disease, right foraminal stenosis, and spinal arthritis.

On January 19, 2021, Plaintiff saw his primary care provider, PA Stewart, for the first time since September for his annual physical. AR 686-92. He reported continued back pain, treated by physical medicine. He said his back pain made him less active and tired. On objective examination, PA Stewart noted "no acute distress other than moving stiffly"; slow changing positions; and deep tendon reflexes 1+ in right knee. She ordered bloodwork based on Plaintiff's fatigue complaints.

On February 1, 2021, Plaintiff completed a pain questionnaire for the Social Security Administration. AR 398-400. He reported pain in his lumbar spine radiating to his buttocks and down his right leg when walking or standing. He said he felt moderate pain all the time (sitting, moving), except when lying flat, and sharp, burning pain down his right leg with walking or standing. He said that his pain affected his ability to drive, go places without assistance, lift or carry "much at all," sit and stand for very long, and focus when his pain was "bad enough." He said he had tried physical therapy, water therapy, shots, an epidural shot, and steroid packs, and none helped "outside of the day of shots." That same day, Plaintiff completed a function report. AR 401-08. He stated he lived with his parents. He described a typical day as, "wake up, take meds, pour a cup of coffee, sit down, play video games for a little while, walk around once back starts to hurt more, use a heating pad to help, lay down for a while and relax, as the pain of movement and sitting gets unbearable, in bed most of the time, then I try to sleep." He said his pain affected his ability to stand from the toilet, he used a stool to bathe, it took a "decent amount of time" to dress, and he did not shave often. He said he could make simple meals of sandwiches or reheating meals (he reported he did not cook and his parents made plates for him), noting he could not stand for long and used a cane for balance. He said he could clean small things that did not require bending or lifting, which

he tried to do once a week. He reported leaving the house twice a week, either going out on a walk for exercise, or riding in a car as a passenger; it would not be safe for him to drive since "every bump in the road feels like a kick in the back." He indicated he shopped in stores and online for movies and food. His hobbies included playing sports, go-karting, television, and video games, but he said he could no longer do the first two (he watched television and played video games daily). He said he did not spend time with others in person, but he texted and played video games with others daily. He checked boxes indicating his pain affected his ability to lift, squat, bend, stand, walk, sit, kneel, and climb stairs (but not reach), explaining he could not lift more than five to ten pounds without help (about a half gallon of milk), he walked with a cane due to the radiating pain down his right leg, he could walk less than 150 feet before needing to lie down, he could only sit for twenty to thirty minutes at a time, he had to take the steps one at a time with breaks, and he had to shift positions from standing, sitting, and lying down multiple times a day. He reported using a cane daily and a walker on the really bad days, noting a doctor prescribed the walker on July 22, 2020 (but the cane had not been prescribed).

On March 8, 2021, Plaintiff followed up with Dr. Mathew at physical medicine. AR 802-03. He reported continued low back pain and right leg weakness, rated as an 8 out of 10 on the pain scale. Dr. Mathew increased his Lyrica dosage, discontinued methocarbamol, and started Celebrex (celecoxib, an NSAID).

On March 29, 2021, the Social Security Administration denied Plaintiff's disability claims on initial review. AR 92-105. As part of that review, state agency consultant Marlene Gernes, DO, reviewed the treatment records and opined as to Plaintiff's physical residual functional capacity (RFC).[17] AR 102-03. Dr. Gernes concluded there was "not

[17] RFC means "the most that a claimant can do despite her limitations." ***Sloan v. Saul***, 933 F.3d 946, 949 (8th Cir. 2019).

any medical evidence of [a] cane or walker being prescribed" and "major inconsistencies in [the] file"—for example, Plaintiff's "use of a cane and lifting limitations" were inconsistent with "objective evidence not showing any radiculopathy of right lower extremity and . . . physical exams with normal straight leg raising testing." Dr. Gernes found Plaintiff could perform light work, including standing or walking six hours in an eight-hour day without using a cane.

On April 26, 2021, Plaintiff completed his disability appeal form. AR 412-15. He said he could not drive at all because of his right leg and lower back, and he could not sit or stand for more than a few minutes before needing to adjust positions or lie down. He said he had terrible balance when his pain was bad and would probably fall down without the cane. He said since his last function report, he could not move around as much as before, climbing stairs had become "more of a hassle to get up and down daily," he suffered more frequent muscle spasms, he could not do laundry or extensive cleaning, and he had no social activities. He noted an upcoming appointment with physical medicine and said he "wants to try physical therapy and injections again to work on the leg issues." That same day, Plaintiff met with Dr. Mathew at physical medicine, requesting an epidural steroid injection. AR 736-38. He rated his back pain 9/10 on the pain scale. Dr. Mathew increased his Lyrica dosage, started tizanidine (a muscle relaxer) at bedtime, continued Celebrex, and referred Plaintiff for an epidural.

On May 13, 2021, Plaintiff returned to Dr. Maze at the pain clinic (for the first time since August 2020). AR 794-98. Plaintiff reported low back pain ranging from a 7 to 10 on the 10-point pain scale that radiated down his right leg to his ankle with weakness and tingling. He said he used a cane to walk. He said his pain was worse with bending and lifting and helped by lying down. Dr. Maze noted that his radicular symptoms did not fit with his MRI results and that he was "willing to try one more time," but "if he fails to make progress," he wanted Plaintiff to see a neurologist. Dr. Maze performed a transforaminal epidural steroid injection.

On May 22, 2021, Plaintiff completed another function report for the Social Security Administration. AR 419-26. He reported severe pain with bending, twisting, lifting, reaching, sitting, or standing for any decent amount of time, relieved only by lying down. He said he could not drive due to bumps in the road causing sharp pain in his spine. He reported walking with a cane due to nerve pain and numbness and weakness in his right leg, causing bad balance. He described a typical day:

> Wake up, very slowly get out of bed, get in the shower ([with] use of a shower stool). Slowly go down the steps (have to use cane and hand rail to slowly go up or down). Drink coffee, sit in chair with heating pad . . . for a little while. Head to my bed and lay back down due to pain. Watch tv, play games, try to relax. Warm something up in microwave for lunch, head back to bed, lay down, eat dinner, sit in bed, play games. Try to walk around 3-5 times throughout the day.

He said he woke up multiple times a night due to pain. He again reported using a shower stool to bathe, rarely shaving, eating microwave meals and takeout, using the toilet by balancing with a cane and having difficulties rising (but not sitting down), and dressing slowly (sometimes sitting or lying down). He reported sharing a room with his brother and performing light bedroom cleaning for about an hour once a week with his brother's help. He rarely did laundry and did not do yard work. He said he went outside two to three times a day, walking with his brother (so that someone was there to help him if he fell) or riding in a car. He said he shopped online and in stores for video games and clothes and occasionally walked around the mall for an hour with breaks to sit. Hobbies included playing sports, fishing, go-karting, axe throwing, video games, and tv, but he said he could no longer do any of these things besides playing video games and watching television. He said that he spent time with others in person eating food or "chill[ing]" a couple of times a week, that he regularly went to the mall to walk around, and that he regularly went to doctor's appointments (which someone had to drive him to). As in his prior function report, he checked boxes indicating his pain impacted his ability to do almost all physical functions, plus he additionally reported pain impacted his ability to

reach, complete tasks, and concentrate. He said he could only lift ten pounds on occasion, he fell squatting due to balance issues and pain, he could only stand briefly with the help of a cane, he had a hard time getting up from kneeling, stairs took a long time to climb, he could only walk for a few minutes before needing to sit or lie down, and sitting "is the worst thing for pain outside of movement." He reported a fear of falling down the steps. In response to the question, "How far can you walk before needing to stop and rest?" he wrote, "As far as I wanted, had no problems." Then he indicated he would need to rest ten to twenty minutes before he could resume walking "depending on pain and if I have to lay down." He again indicated he used a cane outside of the home for movement and balance and to climb stairs, and a walker if his pain was really bad and he had to move—the latter of which was prescribed in 2020.

On May 26, 2021, a nurse with the pain clinic contacted Plaintiff by phone about his pain relief from the epidural. AR 793-94. Plaintiff reported his pain "improved for the first few days and then returned" so that his pain and activity level were the same post-injection. Dr. Maze indicated Plaintiff should see a neurologist and he would not repeat any procedures going forward.

On June 7, 2021, Plaintiff returned to Dr. Mathew at physical medicine. AR 791-93. Plaintiff continued to report back and leg pain rated as 7 out of 10. Dr. Mathew continued Lyrica, tizanidine, and Celebrex, started Cymbalta (duloxetine) (a nerve and mental-health medication), and referred Plaintiff to physical therapy. The same day, the Social Security Administration denied Plaintiff's disability claims on reconsideration. AR 106-119. State agency consultant Melodee Woodard, MD, reviewed the treatment records and affirmed Dr. Gernes's initial RFC finding. AR 116-18. Dr. Woodard recognized that Plaintiff reported he spent most of his time sitting and could not walk without a cane, but she found "numerous medical providers have noted inconsistencies in the [claimant's] performance on effort-dependent testing, both internally and with observed behavior."

On June 14, 2021, Plaintiff began physical therapy. AR 788-91. Plaintiff said his "pain began last year suddenly one day at work," but was "not a work injury" because of his history of back pain (the physical therapist noted a review of his chart showed his symptoms began when his mom gave him a bear hug and popped his back). He reported low back pain (8/10 on the pain scale), radiating down his right leg and causing right-leg weakness and numbness in his right toes. He said his pain worsened with movement and prolonged sitting and standing and improved with lying flat on his back and heat. Plaintiff said his "doctor[s] have told him that he cannot work, even working from home jobs." He reported living with his parents and largely staying in his room due to his difficulties climbing stairs (he had to take them one at a time). He said he could not drive or do much around the house and used a cane at all times. He reported sleeping only three to four hours a night. Plaintiff asked to learn the aquatherapy home exercises from last time since "he did not really do it last time." He also reported that Dr. Mathew had asked him to stop all medications last week to "flush his system" and that he had just restarted his medications today. On objective examination, the physical therapist noted Plaintiff walked with a cane in his right hand "with increased weight down through cane, short step length on [right]"; largely normal strength on the left leg (except 4+/5 on left knee extension); inability to dorsiflex his right ankle; 3/5 strength of the right knee with flexion and extension ("breaks with little pressure applied"); 3+/5 strength with right hip flexion; limited range of motion of the lumbar spine in all direction due to pain; and positive slump tests on the left and right. The physical therapist noted they would plan for one to two visits to re-teach Plaintiff the aquatherapy exercises from last time "to unweight his joints and spine and allow for increased activity." Plaintiff was discharged from physical therapy after his appointment the next week when he was able to perform the exercises independently and indicated he would continue on his own at a gym pool. AR 786-88.

On August 9, 2021, Plaintiff had an appointment with Dr. Mathew at the pain clinic. AR 784-86. He continued to rate his low back pain 7/10 on the pain scale. Dr. Mathew increased his Cymbalta dosage and continued Lyrica, tizanidine, and Celebrex. *Compare* AR 785 *with* AR 793.

On September 13, 2021, Plaintiff reported a change in conditions to the Social Security Administration. AR 429-30. He said that since mid-August, he had been suffering increased pain and numbness in his right leg and decreased mobility.

On September 25, 2021, Plaintiff presented to the ER after being knocked down at a concert. AR 778-82. He said he "twisted and landed on his bottom" and "was not able to get up off of the ground." He reported a "dull ache" at rest and "sharp and radiating [pain] down his right leg" with movement. He said he did not normally have any feeling below his right knee. "When asked by [the nurse] practitioner about his back pain, he stated that it has been going on for over a year," but "[w]hen asked by th[e] nurse[,] he denied having chronic back pain." Plaintiff told the nurse practitioner that "[h]e chronically has numbness below his right knee and history of foot drop and uses a cane," and these "symptoms are really the same," but "[h]is pain is significantly worse than normal." On objective examination, the provider noted no acute distress (although she later noted he "appears in pain"); decreased range of motion of the lumbar back; "unable to lift right leg up off of bed, able to flex at hip and drag right foot on bed to flex knee"; cannot move his right foot or ankle, even to wiggle his toes, but patient reports this is his baseline; and sensory deficits and weakness. A lumbar spine x-ray was normal. Plaintiff was provided with pain medications, including hydrocodone-acetaminophen. He felt better on re-evaluation and was "able to ambulate" with a steady gait without dragging his right leg; a nurse also noted Plaintiff was "ambulatory with cane to restroom." The provider noted concerns about his right leg weakness, but Plaintiff assured her it was normal for him. She offered to admit Plaintiff "for pain control due to his worsening pain and weakness, but he declined, since he lived with his

parents and had help at home. She instructed Plaintiff to follow up with Dr. Mathew (Plaintiff did call Dr. Mathew's office, but they did not schedule him to come in earlier than his previously scheduled appointment (AR 778)).

On September 27, 2021, an ER nurse called to check in with Plaintiff. AR 776-77. Plaintiff reported "feeling a little better" and reported taking hydrocodone that day for his pain. The ER nurse "advised" Plaintiff "to use his cane or walker at all times." She also instructed him to make an appointment with his primary care provider.

On September 29, 2021, Plaintiff returned to the ER. AR 772-75. Plaintiff reported increased pain across his lower back, worse on the right side, with a new burning sensation. He said neither muscle relaxants or hydrocodone at home improved his pain. On objective examination, the provider observed pain to palpation on mid-lumbar spine as well as paraspinal muscles, with right worse than left; an ability to flex the hip and knee; and chronic weakness to the foot and ankle that Plaintiff reported was unchanged. Plaintiff and his mother "were concerned the burning sensation could be indicative of a more serious problem and wondered if they need a MRI," but the provider explained that although they may need an MRI at some point, "there was no indication for an emergent one today." The ER provider offered pain medication and instructed Plaintiff to follow up with one of his regular providers.

On October 12, 2021, Plaintiff had his appointment with Dr. Mathew at physical medicine. AR 769-71. Plaintiff continued to report worsening low back pain down the right leg after his fall. Dr. Mathew ordered an EMG of Plaintiff's legs, prescribed a course of steroids, continued Lyrica, and referred Plaintiff to the pain clinic for a lumbar epidural. The list of Plaintiff's current medications also included tizanidine (but not Cymbalta or Celebrex).

On October 18, 2021, Plaintiff presented to Dr. Mathew for an EMG. AR 768-69. He reported "moderate severe low back pain that began last summer ra[dia]ting down his right leg" with "associated numbness and tingling" that "began at work." On

objective examination, Dr. Mathew observed tenderness to the lumbar spine, paraspinal muscles, and right sacroiliac joint; reduced spinal range of motion; increased sensitivity down the right leg; 4/5 strength in the right leg and 3+/5 strength in the right ankle; 1+ knee reflexes; antalgic gait; and good sitting balance. The EMG results were "most consistent" with "right S1 radiculopathy." Dr. Mathew indicated he would order a new lumbar spine MRI. This MRI was never scheduled, although Plaintiff testified at the ALJ hearing that he kept pushing his doctor to get it completed. AR 85.

On October 28, 2021, Plaintiff called Dr. Mathew's office, noting that the pain clinic would not set an appointment for him until it received a referral from Dr. Mathew (for insurance purposes). AR 1270-71. A nurse messaged Dr. Mathew confirming that she should send the referral as mentioned in Dr. Mathew's last note. She also instructed Plaintiff to wait three weeks after finishing his steroid course before receiving an injection.

On November 11, 2021, Plaintiff returned to Dr. Mathew at physical medicine. AR 766-67. He continued to report worsening back and right leg pain following his slip-and-fall, which he rated at 9/10 on the pain scale. He reported "overall doing fair" and that "CBD oil has been very helpful." Dr. Mathew's "plan" included continuing tizanidine as needed, referral for a lumbar epidural, and starting a course of steroids. Lyrica, Cymbalta, and Celebrex were not listed on the medications list. Dr. Mathew wrote Plaintiff a note for a disability parking sticker, stating he could not "walk 200 feet without stopping to rest." AR 1253.

On January 11, 2022, Plaintiff had an appointment with Dr. Mathew at physical medicine. AR 763-65. Dr. Mathew's treatment notes reflect pain in the back and right leg rated at 9/10 and "doing fair." Dr. Mathew performed lidocaine injections in the "bilateral tronchanteric bursa" and noted Plaintiff reported pain improved 70% post-injection. The only back pain medication listed on Plaintiff's medication list was tizanidine. Dr. Mathew referred Plaintiff to the pain clinic. AR 763, 1205.

On January 21, 2022, Plaintiff met with primary care provider PA Stewart for his annual physical. AR 757-59. He reported no change to his chronic back pain, seeing Dr. Mathew for treatment, and "us[ing] occasional THC to help with pain." On objective examination, PA Stewart noted "no acute distress other than limping and using cane." AR 761.

On March 1, 2022, Plaintiff visited Dr. Mathew at physical medicine. AR 754-57. Dr. Mathew's treatment note reflects Plaintiff rated his pain as a "10 Worst Pain Ever" but also said he was "overall doing fair." Dr. Mathew continued tizanidine as needed; the medication list additionally included Cymbalta.

On March 10, 2022, during a gastroenterology appointment, the provider observed gross motor function on neurological exam. AR 750. He made the same findings in July 2022 and September 2023. AR 1357, 1464.

On March 15, 2022, Plaintiff attended a pain empowerment therapy group. AR 745-47. He reported pain in the low back, spine, and right leg, rated at 9 out of 10 on average that interfered with his activities. He reported he received support from family and friends. He was not interested in continued sessions.

On May 3, 2022, Plaintiff had an appointment with Dr. Mathew at physical medicine. AR 1127-29. Plaintiff rated his pain 8/10 and reported continued limited mobility and chronic pain that made it difficult to work and required alternating positions frequently. Dr. Mathew continued Cymbalta and tizanidine (per the medications list).

On August 2, 2022, Plaintiff met with Dr. Mathew at physical medicine. AR 1101-03. Dr. Mathew's treatment note emphasizes in bold that he was "in full support" of Plaintiff's disability application. Dr. Mathew continued Cymbalta and tizanidine (per the medications list).

On August 22, 2022, Plaintiff messaged Dr. Mathew's office, asking for "a medical card for weed, so [he doesn't] have to go all the way to Illinois." AR 1089. A nurse responded that there was "only a CBD oil program in [I]owa."

In late September 2022, Plaintiff testified at the first ALJ hearing that he suffered from spinal stenosis and bone spurs seen on MRI with sciatica and pain radiating down his right leg. AR 73. He said he could not sit or stand for more than ten or fifteen minutes at a time due to pain without shifting positions. AR 73, 78. Plaintiff testified that although he had a driver's license, he did not drive because bumps in the road caused discomfort to his back. AR 68. He testified he had to take "a lot of breaks" with any task and lie down when the pain "gets bad enough." *Id.* He described his back pain as constant and achy, rated at a seven or eight on the pain scale, sharp with activity, and a "burning shocky feeling down [his] right leg . . . with movement until about the knee." AR 73-74. From the knee to his foot, he testified his leg felt tingly and numb and was weak. AR 73, 76. He reported being unable to "reach down and touch the floor" and needing to use a cane to walk. AR 74. Although his pain mainly radiated down his right leg, he said he would lose feeling in his left foot when lying down flat. *Id.* He testified he wore a back brace, which helped. AR 75. He said his foot drop made it harder to walk around and he had tripped on rugs three or four times in the past. AR 77. He said he could not sit in an office chair and noted he was alternating between sitting and standing during the hearing. AR 78. He testified that he could walk for 100 feet before needing to sit and rest for fifteen to twenty minutes. AR 79. He thought he could frequently lift "less than five pounds," noting "a gallon of milk is a struggle occasionally," and could lift a maximum of eight to ten pounds a couple of times a day. *Id.* He said pain affected his ability to sleep and caused fatigue such that he napped two to three times a day. AR 80-81. The ALJ noted treatment records indicating that CBD oil had been "very helpful" for his low back pain and asked about the status of that. AR 84-85. Plaintiff said he had tried it for a while and it stopped giving him relief. *Id.*

On October 4, 2022, Plaintiff had an appointment with Dr. Mathew at physical medicine. AR 1064-66. Dr. Mathew continued Cymbalta and tizanidine (per the medications list). He started gabapentin. AR 1385. During later visits with Dr. Matthew

in 2023, the medication list (which includes prescriptions from other providers) listed these medications with the addition of Decadron (dexamethasone) (a steroid) on February 7 and acetaminophen-codeine on February 7 (AR 1404-06), May 9 (AR 1435-37), July 11 (AR 1453-55), and August 29 (AR 1472-74).

On January 23, 2023, at his annual physical with PA Stewart, Plaintiff reported no recent change to his chronic back pain and right-sided sciatica. AR 1391. He said he could "walk to his car before getting pain." *Id.* PA Stewart's objective examination reflects no acute distress, intact reflexes, and using a cane. AR 1396.

Plaintiff had appointments with providers related to migraines. On February 27, 2023, on objective examination PA Stewart noted "no acute distress," "walking with cane," and "4/3 bilateral leg/foot strength other than 0/5 strength right foot (chronic)." AR 1413. On March 27, 2023, she recorded "no acute distress," "4/3 bilateral leg/foot strength other than 0/5 strength right foot (chronic)," "absent knee and ankle jerks bilaterally," and an inability "to do heel-to-toe walking."[18] AR 1418. On June 28, 2023, a different provider observed no acute distress, normal deep tendon reflexes, normal strength and muscle tone, and left-sided limp requiring use of a cane. AR 1342. On August 29, 2023, a provider observed normal gait (AR 1337), and on November 27, 2023, no acute distress, uses cane, normal strength and muscle tone, and normal deep tendon reflexes (AR 1333).

On January 2, 2024, Plaintiff had his annual physical with PA Stewart. AR 1480-86. He reported unchanged back pain and chronic right leg weakness and numbness below the knee. He said he walked around the block for exercise every other day. On objective examination, PA Stewart observed no acute distress, walks with a cane, intact deep tendon reflexes "other than absent right knee/ankle," "0/5 strength right foot

[18] PA Stewart also observed no acute distress at additional migraine appointments. AR 1429, 1443.

dorsiflexion/plantar flexion," and "decreased sensation to touch below right knee." PA Stewart noted she discussed pain psychology with Plaintiff. She also discussed his right lower leg weakness and numbness, which Plaintiff believed was unchanged since his last MRI, but he was not sure. He declined rechecking his MRI and said he would discuss the matter with Dr. Mathew. PA Stewart also suggested talking about his symptoms with his neurologist at his next headache appointment. PA Stewart suggested an ankle-foot orthotic for Plaintiff's right foot drop.

On January 9, 2024, Plaintiff met with Dr. Mathew. AR 1493-96. Dr. Mathew started Elavil (amitriptyline) at bedtime and stopped gabapentin. The medication list also included acetaminophen-codeine, Cymbalta, and tizanidine. Dr. Matthew increased the Elavil dosage and ordered an ankle-foot orthotic on March 5, 2024 (the medication list additionally included acetaminophen-codeine, Cymbalta, and tizanidine). AR 1501-03.

In April 2024, Plaintiff testified at the second ALJ hearing. He continued to state he relied on his mother or twin brother for rides, noting bumps in the road caused back pain such that his driving would pose a safety risk. AR 46. He testified that his back pain was dull, achy, and constant, and exacerbated with movement, which also caused a sharp electric pain down his right leg. AR 47. He stated that he was numb below his right knee. AR 49. He said he still suffered a right foot drop and dragged his foot behind him, which had caused him to fall a couple of times and made it difficult to climb stairs and ramps. AR 50. In addition to the cane, he used an ankle-foot orthotic on his leg to help with his foot drag (and showed it to the ALJ). AR 51. He said he needed a new back brace and would discuss with Dr. Mathew at his appointment the next month; and he continued to use a cane, which he had at the hearing. AR 48. He estimated he could lift a maximum eight to ten pounds every once in a while, like a gallon of milk, he could sit ten to fifteen minutes and stand fifteen to twenty minutes before needing to shift positions, and he could walk less than 100 feet before he would need lie down and rest for "well over an hour." AR 48, 51-52. He said lying down and hunching over improved

his pain temporarily. AR 51. He said his pain caused interrupted sleep and fatigue and he "rest[ed]" (not necessarily a nap) four or five times a day. AR 53. He said he took Cymbalta and gabapentin for pain, which helped lessen but not totally eliminate the pain. AR 56.

### *B. Migraine Treatment*

In addition to complaining of back pain, a treatment record first mentions Plaintiff's headache complaints in mid-April 2020, when he was working for the pawn shop. AR 632-34. Plaintiff had an appointment with his primary care provider via telephone due to the coronavirus pandemic. He reported suffering from a headache for the last two days, which he said was "not necessarily abnormal," since he had suffered frequent headaches since he was 16 years old and generally had five to six headaches a week with migraines twice a week (with nausea and photophobia and phonophobia). He said he had never been treated for headaches and over-the-counter migraine medications "help[ed] . . . some." He also reported a cough, and the provider told him to proceed as if he had the coronavirus (he ultimately tested negative). *Id.*; AR 639. The provider prescribed Topamax (topiramate) (25 mg) as a preventative and Maxalt (rizatriptan) as an abortive for migraine headaches. AR 632.

A week later, on April 28, 2020, Plaintiff had a follow-up telephone appointment with his primary care provider, largely related to his cough. AR 639-41. He reported no changes to his headaches and suffering a migraine five days a week lasting for ten minutes to a day.

At an appointment for back pain in August 2020, he reported "occasional headaches." AR 579. At his annual physical with PA Stewart in January 2021, Plaintiff reported that he suffered a migraine once a week and that Maxalt worked well. AR 686. He did not appear to be taking topiramate, and PA Stewart noted he could contact her if he wanted a prophylactic. AR 692. At his annual physical with PA Stewart in January

2022, Plaintiff again reported migraines once a week and that Maxalt worked well. AR 758. PA Stewart continued his medications and noted his migraines were stable.

In late September 2022, Plaintiff testified at the first ALJ hearing that he suffered from "migraine headaches that can be extremely debilitating" and "can put me down for days at a time." AR 73. He testified that he suffered from migraines that started with seeing flashes of light. AR 81. He said he experienced these headaches three to four times a week, lasting three or four hours on average, but at longest, two days or a little more. AR 81-82. He said for a "lesser migraine," he took medicine and laid down, but for a "bad migraine," which he experienced twice a month," he would be "laid up for a day or two." *Id.* He said he felt exhausted and fatigued after a migraine. *Id.* He said his migraine medication (Maxalt) did not "completely get rid of" his migraine but made "it less of a painful debilitating experience." AR 83. The ALJ noted Plaintiff had not visited any provider specifically for migraines, instead simply mentioning them at his annual physical, and Plaintiff agreed with this assessment. AR 84.

In January 2023, Plaintiff had his annual physical with PA Stewart. AR 1390-97. He reported migraines "3-4 days a week for the last 6 months," "temporal with photosensitivity and nausea like other migraines." He reported rizatriptan (Maxalt) usually worked, which he took three to four days a week. PA Stewart prescribed a preventative migraine medication, topiramate. Her medication list (which includes medications from other providers) also lists Zofran, an anti-nausea medication, prescribed by gastroenterology related to liver issues.

On February 27, 2023, Plaintiff followed up with PA Stewart regarding his migraines. AR 1412-13. He reported he continued to suffer migraines four to five times a week, but they were less severe since starting topiramate a month ago. He said his migraines could last anywhere from one to twenty-four hours and rated them a 5 to 9 on the 10-point pain scale. His migraines caused "sparkling vision" (auras), photophobia, phonophobia, and nausea or vomiting (helped with medications). PA Stewart concluded

his migraines were "improving but uncontrolled." She increased his topiramate dosage and recommended vitamin supplements to help with migraine presentation (magnesium, riboflavin, or extract of butterbur root).

On March 27, 2023, Plaintiff returned to PA Stewart related to his migraines. AR 1417-18. Plaintiff reported improvement with topiramate and only getting a migraine twice a week. He did not try the supplements PA Stewart had recommended at the last appointment. He said naps and Maxalt (his abortive medication) helped when he had a migraine. He denied vision changes or nausea or vomiting with migraines, but he did report photophobia and phonophobia. PA Stewart increased his topiramate dosage and again recommended vitamin supplements.

Plaintiff next met with PA Stewart for migraines on April 28, 2023. AR 1428-29. Plaintiff reported no change in his migraines with the increased topiramate dosage and "tr[ying] magnesium." He reported suffering two migraines a week lasting two to twenty-four hours with accompanying photophobia, phonophobia, and nausea or vomiting. PA Stewart indicated she could prescribe propranolol or increase his topiramate dosage again, and Plaintiff chose the latter. She also recommended riboflavin.

On June 1, 2023, Plaintiff returned to PA Stewart at primary care. AR 1443-44. Her treatment note reflects that Plaintiff stopped topiramate two weeks prior "due to metabolic acidosis" and began propranolol as a migraine preventative instead. Plaintiff reported his migraines were similar on propranolol as they had been on topiramate. He reported suffering three to four in the past week, and he said his migraines lasted two hours if he could sleep, otherwise they lasted all day. They came with photophobia, phonophobia, and occasionally nausea. He reported taking Maxalt (his migraine abortive medication) one to two times a week. PA Stewart noted propranolol has not been effective and he was already taking gabapentin. She increased his propranolol dosage and referred him to neurology.

On June 6, 2023, Plaintiff underwent a head CT[19] scan, which was normal. *See* AR 1340.

On June 28, 2023, Plaintiff met with nurse practitioner (NP) Margaret Stracuzzi in neurology. AR 1339-43. Plaintiff reported suffering headaches since he was a pre-teen. He said he suffered headaches 20 days a month that built over two to three hours and lasted anywhere from one to three days. He reported dizziness, light and sound sensitivity, worsening of baseline nausea,[20] and the occasional flashing lights or ringing ears (aura) with his headaches. He said his headaches improved with sleep in a dark quiet room. NP Stracuzzi changed his abortive medication from Maxalt to Imitrex (sumatriptan). She also recommended an over-the-counter supplement that contained a combination of magnesium, riboflavin, and feverfew, and had been shown to decrease the frequency, severity, and intensity of migraines.

Plaintiff returned to neurology on August 29, 2023. AR 1335-37. He reported continuing to suffer three to four migraines a week. Plaintiff reported his abortive medications were not effective, so the provider gave him a sample of Nurtec to trial; if it worked, she would send a prescription in, and if it did not, she would trial Ubrelvy instead. Plaintiff also reported propranolol was not effective as a preventative, so the provider tapered him off of this medication and started Ajovy, a monthly injection, instead. When the provider later learned Plaintiff's insurance would not cover this medication, she prescribed Depakote (divalproex sodium). *See* AR 1331.

On November 27, 2023, Plaintiff met with NP Stracuzzi in neurology. AR 1330-33. Plaintiff reported that Depakote did not help his headaches. He said Nurtec (his abortive medication) was "mildly effective" and he felt "a little improved compared to no improvement on triptans," although Nurtec still did not totally get rid of his headaches.

---

[19] Computed tomography.

[20] Plaintiff reported nausea after meals related to fatty liver disease in 2023. *See* AR 1462.

He reported headaches twenty to twenty-five days a month, always lasting longer than four hours, with dizziness, worsening nausea from baseline, light and noise sensitivity, and some with aura, alleviated with sleep and a dark, quiet room. NP Stracuzzi stopped Depakote and started Nurtec every other day as a preventative.

On January 2, 2024, Plaintiff had his annual physical with PA Stewart. AR 1480-86. He reported working with neurology to try new medications for his migraines as his medications had not been working. His medication list included Depakote, and PA Stewart prescribed propranolol. *See also* AR 1498, 1506 (Dr. Mathew's medication list in January and March 2024 listed Depakote and propranolol but not Nurtec).

In February 2024, Plaintiff reported to the Social Security Administration taking Imitrex for migraines (an abortive), prescribed by NP Stracuzzi, and listed no preventative. AR 478; *but compare* AR 478 *with* AR 1493-96, 1501-03 (medication list from Dr. Stanley in January and March 2024 lists many more medications than Plaintiff reported in February 2024).

In April 2024, Plaintiff testified at the second ALJ hearing that his migraines began five or six years ago. AR 54. He said at onset, he experienced light and sound sensitivity and his head would start pulsing and throbbing. *Id.* With a bad migraines that "put [him] down for a day or more," he would additionally experience nausea. *Id.* He testified he suffered migraines three to five times a week. *Id.* He reported lying down in a dark room when he suffered a migraine and that they lasted for an hour or a day or more. AR 55. He reported he needed two hours to recover after a migraine and suffered brain fog, fatigue, and general uneasiness. He testified that his medications did not help the frequency or severity of his migraines and that he took Nurtec[21] every other day; Ajovy, a monthly injectable; propranolol daily; and rizatriptan at onset. AR 56.

---

[21] The transcript says Zyrtec. AR 56.

### *C. Procedural History*

As previously mentioned, Plaintiff filed claims for SSI and DI benefits based on back pain in January 2021, which the Social Security Administration denied in March and June 2021. The ALJ held the first hearing on Plaintiff's disability claims in late September 2022. AR 62-63. The ALJ issued an unfavorable written decision in November 2022. AR 123-31. In October 2023, the Appeals Council granted Plaintiff's request for review and remanded the case back to the ALJ to further discuss Plaintiff's cane usage and migraine headaches. AR 139-41.

The ALJ held a second hearing in April 2024, at which Plaintiff and a vocational expert (VE) testified. AR 39-40. The ALJ issued a written opinion on April 19, 2024, following the five-step process outlined in the regulations[22] to determine whether Plaintiff was disabled. AR 17-32. The ALJ found Plaintiff suffered from the severe impairments of degenerative disc disease of the lumbar spine and obesity. AR 20. The ALJ recognized Plaintiff suffered migraine headaches but found them to be nonsevere based on inconsistencies between Plaintiff's testimony and treatment records. AR 21-22. To aid in steps four and five, the ALJ determined Plaintiff's RFC, finding Plaintiff could perform light work[23] "except with the ability to occasionally climb, balance, stoop, kneel, crouch, and crawl." AR 22. The ALJ found there was not "a medical need" for a cane

---

[22] "During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security . . . listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." ***Grindley v. Kijakazi***, 9 F.4th 622, 628 (8th Cir. 2021) (quoting ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005)); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)**. The claimant bears the burden of persuasion to prove disability. ***Goff***, 421 F.3d at 790.

[23] Light work requires the ability to lift and carry ten pounds frequently and twenty pounds occasionally, and to stand, walk, and sit (with normal breaks) for a total of about six hours in an eight-hour workday. **20 C.F.R. §§ 404.1567(b), 416.967(b)**; **SSR 83-10**, 1983 WL 31251, at *5-6 (Jan. 1, 1983); *see also, e.g.*, **SSR 96-9p**, 61 Fed. Reg. 34478, 34480 (July 2, 1996).

due to many inconsistencies in the record and limited MRI findings. AR 29. The ALJ found persuasive the opinions of the state agency consultants. AR 30. Relying on VE testimony, the ALJ found Plaintiff could perform his past work as generally performed. AR 31-32. Therefore, the ALJ found Plaintiff was not disabled from June 22, 2020, through April 24, 2024, the date of the decision. AR 32.

The Appeals Council denied Plaintiff's request for review on April 25, 2025 (AR 1-3), making the ALJ's decision that Plaintiff was not disabled the final decision of the Commissioner.[24] Plaintiff filed a timely complaint in this court (Doc. 1).[25] The parties briefed the issues (Docs. 6, 12-13) and the Honorable C.J. Williams, Chief District Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

## *II. DISCUSSION*

So long as substantial evidence in the record as a whole supports the ALJ's decision, a reviewing court must affirm.[26] "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[27] The court "do[es] not reweigh the evidence or review the factual record de novo."[28] If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[29]

Plaintiff's arguments are somewhat muddled. Plaintiff argues the ALJ erred in

---

[24] *See* **20 C.F.R. §§ 404.981, 416.1481**.

[25] *See* **20 C.F.R. § 422.210(c)**.

[26] ***Grindley***, 9 F.4th at 627; *accord* **42 U.S.C. § 405(g)**.

[27] ***Kirby v. Astrue***, 500 F.3d 705, 707 (8th Cir. 2007).

[28] ***Naber v. Shalala***, 22 F.3d 186, 188 (8th Cir. 1994).

[29] ***Robinson v. Sullivan***, 956 F.2d 836, 838 (8th Cir. 1992).

evaluating his subjective complaints. Doc. 6 at 19-21. Under the heading, "the ALJ erred in finding that the claimant retains the [RFC] to perform a limited range of light work," Plaintiff argues that the ALJ erred in rejecting medical evidence from Dr. Mathew and the "consistent document[ation of Plaintiff's] use of and need for a cane to ambulate." *Id.* at 21-24; *see also* Doc. 13 at 1, 4 (reply brief argues the ALJ erred in failing to include Plaintiff's need for an assistive device to ambulate and in discounting "the opinions and findings of" Dr. Mathew). Plaintiff also argues that "the ALJ erred in failing to consider all of [his] impairments in combination," mentioning several conditions in one sentence that the ALJ did "not even discuss[],"[30] then immediately shifts to a paragraph arguing the RFC should have included the use of a cane and a paragraph arguing his migraines are severe. Doc. 6 at 17-19; *see also* Doc. 13 at 1-3 (reply brief argues the ALJ failed to properly consider Plaintiff's cane and migraine headaches). Plaintiff argues that the ALJ erred in finding he could perform his past work, stating "the ALJ neglected to properly consider" Plaintiff's "need to use a cane, use of a foot orthotic, and prescription for a TENS unit," as well as suggesting that Plaintiff could not perform his past work as actually performed "at the medium and heavy levels of exertion." Doc. 6 at 24-25. Finally, Plaintiff argues the ALJ needed to develop the record and order a consultative examination, as the ALJ rejected Dr. Mathew's findings and no medical evidence supports the ALJ's RFC determination. *Id.* Many of these arguments boil down to the same issue—whether substantial evidence supports the ALJ's failure to include in the RFC the use of a cane or limitations related to migraines.

[30] Any failure to discuss Plaintiff's chest pain and other impairments mentioned only briefly in the treatment records should be rejected for the reasons given by the Commissioner. *See* Doc. 12 at 3-4.

### *A. Subjective Complaints*

Plaintiff argues that the ALJ erred in failing to fully credit his subjective pain complaints. When evaluating a claimant's subjective complaints—including pain—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."[31] "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."[32] The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary,"[33] or "inconsistencies in the record as a whole."[34] Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"[35]

Plaintiff argues that the "ALJ offered little explanation for why []he found [Plaintiff's] testimony not to be credible, other than to cite some minor inconsistencies." Doc. 6. Plaintiff suggests the ALJ made a "single, conclusory statement." *Id.* Plaintiff additionally argues an ALJ cannot discount a Plaintiff's pain statements based on the Plaintiff's failure to "sit and squirm" during the ALJ hearing. *Id.*

---

[31] ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord* ***Polaski***, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986). The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. ***Jones v. Callahan***, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

[32] ***Black***, 143 F.3d at 386.

[33] ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002).

[34] ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993).

[35] ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)).

Nowhere in the ALJ's opinion did he rely on Plaintiff's failure to squirm at the hearing. Rather than making a conclusory statement about inconsistencies between Plaintiff's subjective reports and the treatment records, the ALJ provides one of the most thorough accountings of inconsistencies that this court has seen. *See* AR 23-30. Of particular significance, Plaintiff testified at the first hearing in September 2022 about suffering debilitating migraines multiple times a week, yet he had barely sought any treatment for migraines at that point[36] and had declined the need for a preventative migraine medication. In addition, he testified that his migraines began "five to six years" before the hearing in April 2024, but numerous treatment records reflect he has suffered migraines since he was a teenager—suggesting that his migraines are not as severe as he alleged, since he had worked full-time despite his migraines.

As for back pain, the ALJ noted numerous instances of wildly different results on objective examination (e.g., no strength or full strength; no reflex or normal reflex), including at least one time on the same day, despite treatment records reflecting Plaintiff generally reported the same symptoms. In 2020, Plaintiff routinely told providers his back pain began with a bear hug from his mom, but in 2021, he said it was a workplace injury. At the ER in September 2021, he originally told the nurse he did not suffer from chronic back pain, then backtracked and told the nurse practitioner provider otherwise. The ALJ noted Plaintiff alleged an onset date of June 2020, despite all evidence showing his severe back pain symptoms did not begin until July 2020. While this could have been merely a typographical error on Plaintiff's part, I cannot say substantial evidence does not support the ALJ's decision to rely on this inconsistency when combined with everything else. Plaintiff's reports of his symptoms to the Social Security Administration suggest he could not do much more than lie in bed all day, but as the ALJ noted, he was

[36] Plaintiff also testified to other symptoms at the September 2022 hearing that are reflected nowhere in the treatment notes, like extreme fatigue requiring multiple naps a day and left-sided numbness when lying down.

able to go to a concert (although he obtained an injury necessitating an ER visit). Throughout summer 2020 when his pain first began, treatment records reflect Plaintiff reported no issues sitting (and PA Stewart even issued a letter for Plaintiff's work stating he could perform seated work at the pawn shop); but then Plaintiff reported to the Social Security Administration he could sit for only twenty to thirty minutes at a time (in February 2021), "a few minutes" at a time (in April 2021), and ten to fifteen minutes at a time (in September 2022 and April 2024).

Overall, substantial evidence supports the ALJ's finding of inconsistencies in the record that call Plaintiff's subjective complaints about his symptoms into question. I recommend finding that the ALJ did not err in failing to find Plaintiff as limited as he alleged.

### *B. Dr. Mathew's Opinion*

Plaintiff argues that the ALJ erred in evaluating the persuasiveness of Dr. Mathew's opinion and findings. For claims filed after March 2017 (like Plaintiff's), the ALJ no longer "assign[s] a specific weight to medical opinions."[37] Instead, the ALJ "evaluate[s] the persuasiveness of medical opinions" considering the following factors: (1) supportability, i.e., "the objective medical evidence and supporting explanations presented by a medical source" in support of his or her opinion; (2) consistency with "evidence from other medical sources and nonmedical sources"; (3) the relationship between the opinion's author and the claimant, such as whether the opinion is from a treating source; (4) whether the medical opinion is by a specialist; and (5) "other factors that tend to support or contradict a medical opinion," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding

[37] *Revisions to Rules Regarding the Evaluation of Medical Evidence*, **82 Fed. Reg. 5844**, 5858 (Jan. 18, 2017); *see also* **20 C.F.R. §§ 404.1520c(a), 416.920c(a)**.

of [the Social Security Administration's] policies and evidentiary requirements."[38] The first two factors, supportability and consistency, are the most important.[39] The ALJ is required to "articulate how [the ALJ] considered the medical opinions" and "explain how [the ALJ] considered the supportability and consistency factors."[40]

Plaintiff argues that the ALJ erred by discounting the diagnoses and objective examinations shown in Dr. Mathew's treatment notes, as well as Dr. Mathew's notations that he supported Plaintiff's disability application. These arguments will be addressed further in the discussion on Plaintiff's need for a cane. But Dr. Mathew's findings reflected in treatment notes that do not include functional restrictions are not "medical opinions" subject to the persuasiveness analysis.[41]

I agree with the Commissioner that Dr. Mathew's only "medical opinion" under the regulations is his November 2021 note to support Plaintiff's application for a disabled parking sticker, which opines Plaintiff could not "walk 200 feet without stopping to rest." AR 1253. The ALJ found this opinion unpersuasive. AR 28. The ALJ noted the claimant had gone to a concert in September 2021, "supporting greater ambulation abilities." *Id.* The ALJ also pointed to Plaintiff's inconsistent objective examinations, relatively normal imaging, and normal neurological exams at migraine appointments in 2023. *Id.* As will be discussed further below in the section on Plaintiff's use of a cane, I find that the ALJ relied too heavily on what he characterized as the lack of objective

---

[38] **20 C.F.R. §§ 404.1520c(a), (c), 416.920c(a), (c)**.

[39] **20 C.F.R. §§ 404.1520c(a), 416.920c(a)**.

[40] **20 C.F.R. §§ 404.1520c(a), (b)(2), 416.920c(a), (b)(2)**.

[41] *See* **20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2)** ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in . . . abilities . . . such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions"); *see also* **20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1)** (stating that "opinions on issues reserved to the Commissioner," such as "[a] statement by a medical source that [the claimant is] 'disabled' or 'unable to work'" is not a medical opinion).

findings. But I ultimately find substantial evidence supports the ALJ's conclusion that the inconsistencies in the record call Dr. Mathew's opinion into question. Although I might have found Plaintiff's ability to stand and walk more limited than the ALJ, I agree with the ALJ that it appears Plaintiff could do more than he let on (to the Social Security Administration and perhaps to Dr. Mathew as well). Given the deferential substantial-evidence standard, I recommend finding that the ALJ did not err in evaluating the persuasiveness of Dr. Mathew's opinion.

### *C. Migraines*

Plaintiff argues that the ALJ erred in finding his migraines non-severe at step two and failing to include any functional restrictions in his RFC related to migraines. During step two, whether evaluating a physical or mental impairment, the ALJ must first "determine whether [a claimant] ha[s] a medically determinable . . . impairment[]" that "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques."[42] If the ALJ determines the claimant suffers from a medically determinable impairment, the ALJ must next decide whether the impairment is severe by evaluating the degree of functional limitation caused by the impairment.[43] An impairment is severe if it "significantly limit[s] [the claimant's] physical or mental ability to do basic work activities"—including "[p]hysical functions such as walking, standing, [or] sitting," or mental functions such as "[u]nderstanding, carrying out, and remembering simple instructions.[44] An impairment is not severe if it "would have no more than a minimal effect on the claimant's

[42] **20 C.F.R. §§ 404.1521, 416.921**.

[43] ***Id.***; **20 C.F.R. §§ 404.1522, 416.922**.

[44] ***Id.***

ability to work."[45] "Severity is not an onerous requirement for the claimant to meet" (and has been described as a de minimus standard), "but it is also not a toothless standard."[46]

Here, the ALJ recognized that Plaintiff reported suffering from migraines. AR 20-21. The ALJ found his migraines did not "cause[] any functional deficits" and were therefore nonsevere. *Id.* The ALJ noted that although Plaintiff testified that his migraines began in 2018 or 2019, he told numerous providers that his migraines started when he was a teenager—and he had been able to work full-time throughout his early 20s. In addition, Plaintiff did not allege migraines as a reason for disability in his January 2021 application, nor report migraines as a problem impacting his ability to work in Social Security forms throughout 2021. AR 93, 398-400, 412-15, 419-26, 429-30. Then at the September 2022 ALJ hearing, Plaintiff testified to suffering from debilitating migraines multiple times a week lasting for hours to days at a time, despite only being prescribed an abortive migraine medication at his annual physical (that he said worked well to control the headaches he suffered once a week, declining a prophylactic medication). After the hearing, Plaintiff still did not seek migraine treatment or otherwise complain of headaches until his next annual physical in January 2023. Throughout 2023, Plaintiff tried various migraine medications and continued to complain of suffering as many as five migraines a week lasting for hours at a time. But as the ALJ noted, he had also reported suffering five migraines a week in April 2020. Substantial evidence supports the ALJ's conclusion that "the claimant reported a long history of migraines without any consistent treatment from the alleged onset date until at least 2023, inconsistent with his allegations" of near-daily debilitating migraines.

---

[45] ***Dixon v. Barnhart***, 353 F.3d 602, 605 (8th Cir. 2003) (quoting ***Simmons v. Massanari***, 264 F.3d 751, 755 (8th Cir. 2001)).

[46] ***Kirby***, 500 F.3d at 708; ***Hudson v. Bowen***, 870 F.2d 1392, 1395 (8th Cir. 1989).

I recommend finding that the ALJ did not err in finding Plaintiff's migraines did not affect his ability to perform basic work activities (and were therefore nonsevere and resulted in no RFC limitations).

### *D. Use of a Cane*

Plaintiff argues that the ALJ erred in failing to include in the RFC his need to use a cane to stand and walk. Guidance from the Social Security Administration provides:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).[47]

"A prescription (or the lack of a prescription) for an assistive device is not necessarily dispositive of the presence or absence of medical necessity, but it is important to the ALJ's analysis."[48]

Here, the ALJ acknowledged that Plaintiff "was given a walker" in July 2020 but noted Plaintiff had never been prescribed a cane (as Plaintiff himself acknowledged). The hospital prescribed a walker "to help with safety of ambulation" in July 2020, and after Plaintiff improved, Plaintiff decided to switch from a walker to a cane. There was no need for any provider to prescribe a cane, as he was able to obtain a cane without a prescription. After his ER hospitalization in September 2021, an ER nurse did advise Plaintiff "to use his cane or walker at all times." Although there may not have been a prescription for a cane, there *was* a prescription for an assistive device.

---

[47] **Social Security Ruling (SSR) 96-9p**, 61 Fed. Reg. 34478, 34482 (July 2, 1996).

[48] ***Patricia M. v. Saul***, No. 18-cv-3462, 2020 WL 3633218, at *7 (D. Minn. Feb. 5, 2020) (citations omitted) (first citing ***Staples v. Astrue***, 329 F. App'x 189, 191-92 (10th Cir. 2009); then citing ***Toland v. Colvin***, 761 F.3d 931, 936 (8th Cir. 2014)), *report and recommendation adopted sub nom.* ***McArdell v. Saul***, 2020 WL 1951748 (Apr. 23, 2020).

But there is no evidence (either in a treatment note or in a medical opinion) explaining the circumstances under which Plaintiff needs to use a cane (all the time? to walk short distances? to shift positions? to stand? etc.). The treatment records are replete with references to Plaintiff's use of a cane. Even when he unexpectedly presented to the ER in September 2021 after a concert, he had his cane with him (and was observed using the cane to walk the short distance from his room to the bathroom). The treatment records overwhelmingly reflect that Plaintiff walked with an antalgic gait or limp and used a cane to walk. But numerous courts have found these types of notations insufficient evidence of medical necessity.[49]

Ultimately, however, even if Plaintiff did not submit sufficient evidence of the circumstances under which he needs to use a cane, I find that substantial evidence does not support the ALJ's finding that Plaintiff could stand or walk for six hours a day

---

[49] *See* ***Howze v. Barnhart***, 53 F. App'x 218, 222 (3d Cir. 2002) (insufficient evidence of medical necessity based on treatment record's reference "to a 'script' for a cane"; doctor's checkbox form indicating "hand-held assistive device medically required for ambulation"; and "multiple references to the fact that [claimant] uses a cane"); ***Edwards v. Berryhill***, No. 17-CV-05092, 2019 WL 1320314, at *15 (D.S.D. Mar. 22, 2019) (insufficient evidence of medical necessity despite "numerous references to [claimant's] use of crutches, canes, and walkers," when only evidence of "prescription" was a "referral[] to physical therapy for the issuance of . . . . a replacement . . . crutch" and again "for a walker after [claimant] complained of falling," which did not "describe[] the circumstances for which it is needed"); *see also* ***Tripp v. Astrue***, 489 F. App'x 951, 955 (7th Cir. 2012) (upholding ALJ's failure to include use of an assistive device in the RFC when treatment records repeatedly referenced claimant's "use of 'crutches,' 'a crutch,' or 'a cane,'" but no provider prescribed an assistive device and claimant simply "*presented* with an assistive device"; and the consultative examiner, who did not conduct "any diagnostic tests, and ha[d] no expertise in orthopaedics," submitted an opinion stating claimant "does need a crutch," which lacked "the specificity necessary to determine whether this was the doctor's *medical* opinion or merely a restatement of what was told to him by [claimant]"); ***Daniel H. v. Comm'r of Soc. Sec.***, No. 24-cv-3047-LTS, 2026 WL 711291, at *4-5 (N.D. Iowa Mar. 13, 2026) (evidence did not establish cane was medically necessary based on treatment notes reflecting antalgic gait and use of cane; no assistive device had been prescribed), *report and recommendation adopted*, 2026 WL 916622 (Mar. 31, 2026).

unassisted.[50] As noted, in essentially every treatment note, Plaintiff is observed to use a cane to walk. Numerous treatment records reflect objective findings such as right-sided weakness, limp or antalgic gait, and spinal tenderness. The ALJ pointed to instances of fairly normal objective examinations and questioned the validity of Plaintiff's symptoms, seeming to make a finding of malingering. But no treatment record reflects a provider believed Plaintiff to be "faking," even when they noted the objective examinations and imaging did not align with symptoms caused by a spinal injury (multiple providers questioned whether Plaintiff needed a neuropsychology referral, one posited his symptoms could be caused by conversion or complex regional pain syndrome, and another specifically noted he found Plaintiff's pain complaints "legitimate" despite the lack of objective evidence). Dr. Mathew indicated he supported Plaintiff's disability application and gave Plaintiff a disability parking sticker. In addition, the October 2021 EMG results corroborated Plaintiff's complaints of right-sided radiculopathy. And Plaintiff has been unable to drive since his back injury in 2020. Although the state agency consultants opined that Plaintiff could stand or walk for six hours in an eight-hour day, they relied in part on the lack of EMG evidence (their opinions were issued before the positive EMG) and a finding that an assistive device had not been prescribed (contrary to the record). The ALJ relied too heavily on his own interpretation of the objective evidence, substituting his opinions for those of Plaintiff's medical providers (none of whom stated the objective results meant Plaintiff's pain complaints were not real).

---

[50] *See* ***Ray v. O'Malley***, No. 23-CV-00074, 2024 WL 4298540, at *4-7 (E.D. Mo. Sept. 26, 2024) (holding that ALJ did not err in failing to include use of cane in RFC from 2020 to 2022 when doctor prescribed cane in 2020 but did not "state the circumstances in which the cane was medically necessary," and only one treatment record reflected claimant using a cane; but that substantial evidence did not support ALJ's RFC determination that claimant could stand or walk for six hours, when objective examinations routinely reflected claimant walked with an abnormal gait or limp; only medical opinions finding claimant could perform light work were from nonexamining state agency consultants in 2017, prior to onset of claimant's gait issues; and ALJ "improperly [drew] her own inferences from" relatively normal imaging results that did not "translate into an ability to stand and/or walk six hours a day, with or without a cane").

Overall, here, I recommend finding that substantial evidence does not support the ALJ's finding that Plaintiff could stand or walk for six hours in an eight-hour day as needed for light work.

### *E. Ability to Perform Past Work*

Plaintiff argues that the ALJ erred in finding Plaintiff could perform his past work. Plaintiff argues the ALJ failed to include all of Plaintiff's alleged limitations in the RFC determination. This argument simply rehashes other arguments Plaintiff has already made. The ALJ may rely on VE testimony "based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies."[51] The ALJ need not include all of a claimant's alleged limitations in the hypothetical, just the ones the ALJ finds substantiated and includes in the RFC. Here, the ALJ's hypothetical included the limitations the ALJ ultimately included in the RFC, and the VE said such an individual could perform the work "per the [Dictionary of Occupational Titles]." AR 22, 31, 58-59.

Plaintiff also suggests the ALJ erred by finding he could perform his past work, since the ALJ limited him to light work, but he performed his past work at the medium and heavy exertional levels. *See* AR 22, 31-32, 58-59. "If [a claimant] can perform h[is] past relevant work, either as []he actually performed it or as the position is generally performed in the national economy, then []he is not 'disabled' within the meaning of the [Social Security] Act."[52] Here, the VE testified (and the ALJ found) that claimant's past work was generally performed at the light exertional level. *See* AR 31, 58-59.

---

[51] ***Gieseke v. Colvin***, 770 F.3d 1186, 1189 (8th Cir. 2014) (quoting ***Cox v. Astrue***, 495 F.3d 614, 620 (8th Cir. 2014)).

[52] ***Sloan***, 933 F.3d at 950 (citing **20 C.F.R. §§ 404.1520(f), 404.1560b), 416.920(f), 416.960(b)**).

The ALJ's findings related to Plaintiff's ability to perform his past work do not provide an independent basis for remand.

## ***III. CONCLUSION***

I recommend **reversing** the Commissioner's decision, entering judgment in favor of Plaintiff, and remanding for further consideration by the Social Security Administration.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.[53] Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein.[54]

**DATED** August 28, 2026.

Kelly K.E. Mahoney
Chief Magistrate Judge
Northern District of Iowa

[53] **Fed. R. Civ. P. 72**.

[54] *See **United States v. Wise***, 588 F.3d 531, 537 n.5 (8th Cir. 2009).